No. 91,041

STATE OF KANSAS, *Appellee,* v. KYLE CAVANESS, *Appellant.*

(101 P.3d 717)

Opinion filed December 3, 2004.

*Carl E. Cornwell,* of Cornwell, Erickson, Travis & Breer, of Olathe, argued the cause, and *Jessica J. Travis,* of the same firm, was with him on the brief for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Bonnie Hannan,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Kyle Cavaness of premeditated first-degree murder, conspiracy to commit premeditated first-degree murder, and aggravated kidnapping. The trial court sentenced the defendant to life on the murder conviction, a consecutive term of 123 months' imprisonment on the conspiracy conviction, and a concurrent term of 165 months' imprisonment on the aggravated kidnapping conviction. The defendant timely appeals, arguing that the trial court erred in refusing his request for a jury instruction on the lesser included offense of unintentional second-degree murder, that the trial court erred in admitting into evidence gruesome pictures of the murder victim, and that insufficient evidence supports his conviction of premeditated first-degree murder. We reject his arguments and affirm.

Kyle Cavaness' sister, Alisha Gray, testified that in October 2002, she was living with the defendant and Ryan Goldenburg at a home in Wyandotte County. The victim, Deangelo Wheeler, had also been staying at the home for a few days before the murder.

Gray testified that on the night of October 9, 2002, Gray, Cavaness, and Wheeler left the house to purchase crack cocaine while Robbie Buehler-May and Goldenburg remained at the house. When they returned to the house, Gray, Cavaness, and Goldenburg smoked the crack while Buehler-May and Wheeler smoked marijuana. Around 5 a.m., Goldenburg and Wheeler left to buy more crack, leaving Gray, Cavaness, and Buehler-May at the house.

When Goldenburg and Wheeler returned, Wheeler realized his marijuana joint was missing and accused Gray, Cavaness, and Buehler-May of stealing it while he was gone. Buehler-May and Wheeler got into a heated verbal argument which eventually involved everyone. Wheeler was told to leave, but he refused. After about an hour, Gray, believing that the men were about to fight,

went into her bedroom. The men went outside. Cavaness had a baseball bat, Goldenburg had bolt cutters, and Buehler-May had a wooden pole. Wheeler had no weapon. Gray heard someone other than Wheeler yell, "Hit him." She then heard someone say, "Get him back in the house." When the men carried Wheeler back into the house, Gray observed that there was a big, bleeding gash on his forehead and that he appeared to be unconscious. Gray returned to her bedroom. When she heard a few more blows, she called Cavaness into her bedroom and asked him whether Wheeler was alive. Cavaness replied, "Yes." Gray stated that, from the time the men came back inside the house, Cavaness spent "[a]lmost the entire time" in Gray's bedroom but did come and go from her room, as did Goldenburg and Buehler-May. Gray heard one of the men say that they could not let Wheeler go in that condition, and no one disagreed.

Cavaness called the next-door neighbor, Michael Dressler, asking him for something with which to tie up Wheeler. When Dressler brought telephone wire over to the house to bind Wheeler, he saw Wheeler lying on the floor with his feet moving. Dressler left and returned later at which time he observed that Wheeler's feet were bound. He heard Wheeler moaning or calling out.

Gray testified that about a half hour after the men brought Wheeler into the house, Buehler-May came into the bedroom and said that he had broken Wheeler's neck and that he was dead. Buehler-May and Goldenburg then wrapped the body in a tarp and put it on the deck.

Ashley McCann testified that she was close friends with Buehler-May. On October 10, 2002, Buehler-May called McCann and asked her to come over to his apartment because he needed to talk to her. When she arrived, Buehler-May told McCann that he had killed someone the night before. Later the same day, Buehler-May and McCann drove to Cavaness' house. Gray, Goldenburg, and Cavaness were at the home. McCann noticed blood on a recliner in the living room, as well as blood on the walls and ceiling. Buehler-May, Goldenburg, and Cavaness began describing how they had beaten and eventually killed the victim the night before. McCann described Cavaness as smiling and laughing during the

conversation. At one point Cavaness lifted a dust pan to show McCann a puddle of blood hidden underneath. Buehler-May pointed out to McCann where the victim's body was outside. McCann heard the men discuss disposing of the body by burning it or throwing it in the river and disposing of their bloody clothes by burning them. That evening, the three men dumped Wheeler's body into the river. Gray later helped Cavaness and Goldenburg try to clean up the living room by scrubbing blood off the walls. The next day, McCann went to the police.

After Cavaness' arrest, Detective Warczakoski and Detective Howard interviewed him. Cavaness waived his *Miranda* rights and made a videotaped statement which was played for the jury but is not included in the record on appeal. According to the detectives' testimony about the statement, Cavaness admitted to participating in the beating of Wheeler, although he also stated Buehler-May was leading the attack. Cavaness said that after Wheeler was brought back into the house, he struck Wheeler between one to three more times with the bat. Cavaness also admitted to having a discussion about whether the men could allow Wheeler to leave the house alive. He stated that the decision to kill Wheeler was a group decision. The entire ordeal lasted 2 hours. After the interview, Cavaness showed the detectives where the men had thrown Wheeler's body into the river and where they had burned the clothes they had been wearing.

An underwater search and rescue team located Wheeler's body a few days after the murder. The body was wrapped in a blue tarp with two bricks attached. The head was covered by a white plastic bag; the legs were bound and the hands tied behind the back.

Forensic pathologist Dr. Erik Mitchell performed the autopsy. He testified that Wheeler had multiple injuries to his head consistent with being struck by a hard object like a baseball bat or bolt cutters. Wheeler's brain was bruised and swollen as a result of his injuries. His neck was also bruised but not broken. Dr. Mitchell testified that Wheeler died as a result of all of the blows to his head. He stated, "You can't isolate a single one and say this one killed him and the others weren't important. For one, you've got a tremendous amount of energy and a lot of them. It looks like many

of them ha[d] the potential to be a killing blow in isolation." Dr. Mitchell also believed Wheeler could have asphyxiated once the plastic bag was placed over his head or the injury to his neck could have "tipped him over the edge" but that absent either of those injuries, Wheeler's brain injuries would have killed him without medical treatment.

Essentially, Cavaness' defense was that because he was high on crack cocaine, he was not thinking clearly and did not premeditate the murder. Cavaness testified he had been using crack cocaine for about 2 months before the murder, he was high on crack cocaine when he hit Wheeler with the bat, and he was also high when he gave his statement to police. Cavaness denied an intent to kill Wheeler but admitted that he hit Wheeler once with the bat outside the house and, after Wheeler was dragged back inside the house, once in the shoulder with the bat. He also stated he kicked Wheeler twice in the chest. Cavaness testified that if these events had taken place at a time when he was not using crack cocaine he would have called the police and left the house, but that night all he could think about was getting another hit of crack. He gave no thought to calling 911 or throwing Buehler-May out of the house. He explained the differences between his testimony and his statement by saying that he lied in his statement to police in an attempt to protect Buehler-May, Goldenburg, and Dressler.

### Did the Trial Court Err in Denying the Defendant's Request for a Jury Instruction on the Lesser Included Offense of Unintentional Second-degree Murder?

As his first claim of error, Cavaness argues the trial court should have granted his request for an instruction on the lesser included offense of unintentional second-degree murder. Cavaness requested instructions on both second-degree murder as defined by K.S.A. 2003 Supp. 21-3402(a) (intentional) and K.S.A. 2003 Supp. 21-3402(b) ("killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life"). The trial court granted the request for an instruction on intentional second-degree murder and instructed the jury on voluntary intoxication as a defense. Re-

garding the request for an instruction on unintentional second-degree murder, the trial court denied the request, noting there was no "basis in the record for that particular instruction."

A trial court must instruct the jury on a lesser included offense "where there is some evidence which would reasonably justify a conviction" of the lesser offense. K.S.A. 2003 Supp. 22-3414(3). "If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive." *State v. Hoge*, 276 Kan. 801, 805, 80 P.3d 52 (2003). On review, the appellate court views the evidence in the light most favorable to the defendant. *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993). "However, the duty to so instruct arises only where there is evidence supporting the lesser crime." *State v. Spry*, 266 Kan. 523, 528, 973 P.2d 783 (1999).

In support of his argument that the trial court should have instructed the jury on unintentional second-degree murder, Cavaness points to his sister's testimony that Cavaness did not continue participating in the beating after the victim was brought back into the house and that it was Buehler-May who stated he had broken the victim's neck and killed him. The defendant also points to his own testimony that he never intended to kill the victim and could not form an intent because he was high on cocaine. Finally, Cavaness cites the testimony of the forensic pathologist who could not identify a single injury as the killing blow.

Neither the pathologist's nor Gray's testimony provides any evidence that Cavaness' actions were reckless; nor does his own testimony. At most, his testimony establishes that death was an unintended consequence of his intentional act of striking Wheeler with the baseball bat. The same argument has been rejected in *State v. Jones*, 267 Kan. 627, 984 P.2d 132 (1999); *State v. Bailey*, 263 Kan. 685, 952 P.2d 1289 (1998); *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997); and *State v. Pierce*, 260 Kan. 859, 927 P.2d 929 (1996). The court in *Jones* discussed each of the other cases extensively as well as other authority which Jones argued supported his position that he was entitled to an instruction on unintentional

second-degree murder because he had just "snapped" and did not intend to kill his victim.

The *Jones* court first discussed *Pierce* in which the defendant stated that he did not intend to kill the victim but was only defending himself when he shot the victim in the leg after the victim pulled a knife. The court stated: "There is no evidence of recklessness. The defendant's actions were intentional . . . . At best the evidence on behalf of the defendant suggested that he did not intend to kill the victim but only defended himself by [intentionally] shooting the victim in the leg." 260 Kan. at 867.

Next, the *Jones* court discussed *Clark*. Clark was convicted of premeditated first-degree murder of his girlfriend and attempted premeditated first-degree murder of a friend. Clark told police officers that he did not intend to kill his girlfriend when he placed a gun to her temple and fired. In rejecting Clark's argument that he was entitled to an instruction on reckless second-degree murder, the court stated that "[t]he only evidence . . . of an accidental shooting was the statement Clark made after arrival of the law enforcement officers . . . . Clark's self-serving statement alone does not support a finding of recklessness." 261 Kan. at 466.

The court in *Jones* then discussed the holding in *Bailey*. Bailey was charged with premeditated first-degree murder and was convicted of intentional second-degree murder. In rejecting Bailey's argument that the jury should have been instructed on reckless second-degree murder on the theory that his intentional shooting was done without regard to the consequences and, therefore, was reckless, the court stated: "We find *Pierce* controlling in the present case. Bailey cites *Pierce* but ignores its clear message—a defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the defendant did not intend to kill the victim." 263 Kan. at 691. The court also examined the legislative history of K.S.A. 21-3402(b) explaining that it was intended to cover so-called "depraved heart" situations and concluding that the legislature did not contemplate the provision applying to the situation of "the defendant's singling out an individual seated only a few feet away, pointing a gun directly at his head, and then firing." 263 Kan. at 691.

The *Jones* court also discussed but distinguished *State v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997), in which the defendant was convicted of reckless second-degree murder after he killed Richard Crowley, who was the initial aggressor, by hitting Crowley in the head with a golf club. Crowley, angry about his sons being threatened by some boys, armed himself with a baseball bat, chased the boys, and swung the bat at them. The boys grabbed golf clubs out of someone's conveniently located bag and turned the tables on Crowley, who began to use the bat defensively. When one of the boys fell, Crowley hit him with the bat. The other boys closed in on Crowley, and Robinson hit Crowley in the head, killing him. Robinson testified that he was attempting to get Crowley to stop hitting the boys and had no intention of hitting Crowley in the head with the golf club but was trying to hit him in the arms. Under those circumstances, the court concluded that a rational factfinder could have found Robinson guilty of reckless second-degree murder. 261 Kan. at 878, 882. The *Jones* court distinguished *Robinson* on the grounds that Jones did not claim to have acted in self-defense. 267 Kan. at 633.

The *Jones* court concluded that, as in *Pierce, Clark*, and *Bailey*, Jones' self-serving statement that he did not intend to kill the victim was "insubstantial and insufficient" to support a theory of a reckless second-degree murder when "Jones used his hands to grip her neck hard enough to break pliable bone and cartilage structures and long enough—4 to 6 minutes—to fatally deprive her of oxygen. His actions were intentional and not reckless." 267 Kan. at 633.

Jones further argued that he was incapable of forming the intent to kill the victim because of his use of alcohol and cocaine. The court rejected this argument, stating:

"What Jones' argument does not take into account is that an intoxicated defendant's being incapable of forming the intent to kill does not transform his or her conduct into conduct so reckless in the circumstances as to manifest extreme indifference to the value of human life. In other words, intoxication can eliminate intent to kill so that the killing is unintentional under the law, but it may not supply the extreme recklessness element of unintentional second-degree murder. Thus, evidence of voluntary intoxication alone will not justify an instruction on reckless second-degree murder as a lesser [included] offense of premeditated first-degree murder." 267 Kan. at 634.

Cavaness makes the same arguments that were rejected in *Jones*. By his own admission, Cavaness struck the victim several times, called the neighbor for something to use to tie up the victim, and discussed with the other men the fact that they could not let the victim leave for fear of retaliation. The evidence demonstrated that Cavaness participated in the acts which resulted in Wheeler's death and did so intentionally. Even though Cavaness' testimony provided evidence that he did not intend to kill Wheeler by hitting him with a baseball bat, none of the evidence, even the defendant's own testimony, indicated reckless rather than intentional conduct. Thus, the trial court did not err in refusing to give an instruction on unintentional second-degree murder as defined in K.S.A. 2003 Supp. 21-3402(b).

### Did the Trial Court Err in Admitting into Evidence Gruesome Photographs of the Murder Victim?

The defendant's next argument is that the trial court erred in allowing the State to introduce into evidence 21 photographs of the victim's body. The defendant argues that these photographs were gruesome, unduly repetitious, not relevant, and introduced solely for the purpose of prejudicing the jury.

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). As we recently stated:

"Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible." *State v. Parker*, 277 Kan. 838, Syl. ¶ 5, 89 P.3d 622 (2004).

In this case, all of the photographs about which a complaint is made are relevant. Exhibit 5 is a photograph of the victim's face taken after he was recovered from the river. Alisha Gray identified the victim from this photograph and testified that the injury to his forehead was consistent with what she had observed on the night

of the murder. The pathologist, Dr. Mitchell, testified that the photograph showed two L-shaped tears on the victim's left forehead and temple, as well as an abrasion on the nose and a laceration on the jaw. Dr. Mitchell explained that most of the victim's injuries were consistent with his having been hit by a bat or bolt cutters.

Crime scene investigator Kim Crockett testified about exhibits 63 through 75. Exhibits 63 through 67 are photographs of the victim wrapped in a tarp with decorative bricks attached, showing different views and close-ups of the bricks and the metallic string that attached the bricks to the tarp. Exhibits 68 through 75 showed how the victim was bound and had a plastic bag placed over his head. These photographs showed the steps taken by Cavaness and others in disposing of the body and concealing the crime. Thus, these photographs were relevant to show the violent nature of the death as well as to provide evidence of premeditation, a contested element of the crime. See *State v. Boone*, 277 Kan. 208, Syl. ¶ 10, 83 P.3d 195 (2004) (conduct after killing relevant to show premeditation).

Dr. Mitchell, the forensic pathologist who performed the autopsy on the victim, testified about the remaining photographs. These were photographs of the different injuries to the victim's head. They showed the extent, nature, and number of the wounds inflicted; showed the violent nature of the death; and assisted Dr. Mitchell in explaining that the cause of death was the head wounds rather than a snapped neck, as theorized by the defendant.

Even though relevant, the trial court had the discretion to exclude the photographs if the probative value was substantially outweighed by the risk of unfair prejudice, see *State v. Dreiling*, 274 Kan. 518, 549, 54 P.3d 475 (2002) or if the photographs were unduly repetitious and cumulative, see *Parker*, 277 Kan. at 847. Discretion is abused only when no reasonable person would take the view adopted by the trial court; the burden of proof is on the party alleging that such discretion has been abused. *State v. Bey*, 270 Kan. 544, 546, 17 P.3d 322 (2001). Having viewed the photographs in this case, we cannot find an abuse of discretion.

As a final argument, the defendant contends that the State could have used exhibit 126 which apparently was a diagram or sketch of

the body with Dr. Mitchell's notes giving the location of the injuries. We reject this argument for several reasons. First, exhibit 126 is not included in the record on appeal. Second, while the defendant did make this argument before the trial court, he did so only after the photographs had already been admitted. Finally, a diagram or sketch is not an adequate substitute for a photograph in its ability to show the jury the nature of the victim's wounds.

The defendant has failed to establish that the trial court abused its discretion in admitting the complained-of photographs.

### Did Sufficient Evidence Support the Defendant's Conviction of Premeditated First-degree Murder?

Finally, the defendant argues the evidence was insufficient to support his conviction of premeditated first-degree murder. According to the defendant, the evidence established that a spontaneous fight occurred between the four men and that, after the victim was brought back into the house, the defendant withdrew from the fight. The defendant contends there was no evidence of premeditation on his part and that Buehler-May actually killed the victim. He contends that the district court should have granted his motion for judgment of acquittal.

In reviewing the denial of a motion for judgment of acquittal, the appellate court examines the sufficiency of the evidence in support of the conviction. *State v. Wiggett*, 273 Kan. 438, 443, 44 P.3d 381 (2002).

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

In this case, the defendant challenges the sufficiency of the evidence in support of the element of premeditation.

"Premeditation may be inferred by the jury from various circumstances, including (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Boone*, 277 Kan. 208, Syl. ¶ 10, 83 P.3d 195 (2004).

There was evidence falling into several of these categories. First, the nature of the weapon used by the defendant was a baseball bat, while the other attackers struck the victim with bolt cutters and a wooden pole. The blows struck by these weapons caused massive head injuries. Because hitting someone with a baseball bat is likely to cause extensive injury or death, its use in this case lends support to the inference of premeditation. See *State v. Beard,* 273 Kan. 789, 803, 46 P.3d 1185 (2002) (hammer just as deadly a weapon as a pipe, baseball bat, knife, or gun; use of hammer to beat victim supported premeditation). As to provocation, although there was evidence that the victim provoked his attackers by accusing them of stealing his marijuana cigarette, there was no evidence that the victim began the physical altercation or that he was armed.

Premeditation can also be inferred from Cavaness' conduct before and after the killing. First, he participated in the fight where he and two other men struck the victim in the head with their weapons, knocking the victim unconscious. They then dragged the victim inside the house and discussed the fact that they could not let the victim leave. Cavaness called the neighbor for rope to tie up the victim. Even the defendant's sister, who testified that the defendant spent "[a]lmost the entire time" in her bedroom, admitted that all of the men came and went from her bedroom. After the victim's death, Cavaness and the other men attempted to clean up the blood in the house, dumped the victim's body in the river, and burned the clothes they had been wearing.

Finally, there was evidence, including Cavaness' own testimony and statement, that the victim was dealt additional blows after he had been felled and rendered helpless. The evidence was sufficient to support the inference that this murder was premeditated.

Affirmed.