(257 P.3d 799)
No. 102,004

STATE OF KANSAS, *Appellee*, v. DERRICK LEE, *Appellant*.

Opinion filed June 10, 2011.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, for appellee.

Before BUSER, P.J., MALONE and STANDRIDGE, JJ.

STANDRIDGE, J.: Derrick Lee appeals his conviction by jury of involuntary manslaughter. For the reasons stated below, we affirm.

## FACTS

In the summer of 2006, Jimmie Mae McConnell lived in a house located in Kansas City, Kansas. That summer McConnell was 70 years old.

On the morning of July 27, 2006, McConnell was working outside in her garden using a rototiller. McConnell's garden was located in her backyard. Around 11:26 a.m., McConnell used her cell phone to call her son-in-law, Leon Barner. When Barner answered

the phone, McConnell said "they got me, call—dial 911." Based on conversations he had with McConnell before this phone call, Barner understood the pronoun "they" to mean the two dogs at the house next door. McConnell previously had disclosed she was worried about the dogs next door, and Barner heard growling in the background during the phone call. In his testimony, Barner referred to the dogs as pit bulls.

Barner called 911 and reported that "pit bulls" were attacking McConnell in her backyard. The Kansas City, Kansas, Fire Department responded to the call. Upon arriving at McConnell's home, firefighter Thomas Stark approached the fence on the west side of the property and observed McConnell lying on the ground motionless in the backyard with the rototiller still running. Stark also saw a dog pacing about 5 to 10 feet away from McConnell. As Stark drew closer, he observed a dog standing on McConnell's legs and biting her inner thigh area. James Johnson, a paramedic, also saw the dog straddling McConnell's legs and biting her. Stark yelled at the dog, and the dog moved away from McConnell. Stark put himself between McConnell and the dog so that the other firefighters could get McConnell out of the yard.

Johnson checked McConnell's pulse but was unable to detect any palpitation. She was not breathing. McConnell was removed from the yard and transported to the hospital. Paramedics observed no signs of breathing during the transport, and McConnell ultimately was pronounced dead at the hospital.

Forensic pathologist Erik Mitchell performed an autopsy. During the course of the autopsy, Mitchell observed numerous external injuries on McConnell's extremities, abdomen, and back. The pattern of the injuries was consistent with biting and tearing of the tissue. Mitchell determined the injuries were caused by an animal with large teeth. Given the residual evidence of tears from her eyes, the location of the injuries, and the extent of hemorrhaging, Mitchell further determined McConnell was alive at the time the injuries were sustained. Regarding cause of death, Mitchell ultimately concluded that McConnell died from a heart attack triggered by the stress she suffered as a result of the attack and the bites.

Ruth Thompson of animal control in Kansas City, Kansas, was sent to McConnell's home. When she arrived, Thompson observed a dog in the backyard with bloody clothing in its mouth. Thompson tranquilized the dog and transported it to Welborn Animal Hospital. John Swanson, a veterinarian at Welborn, examined the dog found in McConnell's backyard.

Testing showed human blood present on the swabs taken from the dog's teeth and gums. Human blood was also present on swabs taken from the dog's mouth, forehead, nose, and neck. A DNA analysis was conducted on the blood found on the dog's neck. McConnell could not be excluded as a possible contributor of the biological material on the swabs from under the dog's neck.

During the investigation, officers learned Derrick Lee owned and resided at the house next to McConnell's. Lee voluntarily went to the police department and spoke with Michael Warczakoski, a detective with the Kansas City, Kansas, police department. After waiving his *Miranda* rights, Lee informed Warczakoski that he cared for a family dog and a stray dog at his house. Warczakoski showed Lee a picture of a brown dog that officers had observed in Lee's backyard. Lee identified this dog as the family dog. Warczakoski also showed Lee a picture of a white dog that was taken from the scene. Lee identified the white dog as the stray dog he had fed and kept at his house for the past 2 to 3 months. The white dog was the dog found in McConnell's backyard.

The State charged Lee with one count of involuntary manslaughter in violation of K.S.A. 21-3404, alleging that Lee unlawfully and intentionally killed McConnell in the commission of, or attempt to commit, a misdemeanor that is enacted for the protection of human safety. The State designated the underlying misdemeanor as unlawfully keeping, harboring, or owning a pit bull dog within the city limits of Kansas City, Kansas, in violation of Kansas City, Kansas/Wyandotte County Municipal Ordinance sec. 7-130 (now sec. 7-219).

The case proceeded to jury trial on April 30, 2007. The jury was unable to reach a verdict, and the district court declared a mistrial. The case was set for retrial.

Prior to the second trial, the State filed a motion to continue the jury trial setting so that the State could obtain DNA testing to determine the breed of Lee's dog. In support of this request, the State argued there was a significant factual dispute in the case regarding whether the dog fit into the definition of " 'pit bull' " under the ordinance and an analysis of the dog's DNA could produce information relevant to this issue. The district court granted the continuance and scheduled a retrial for March 31, 2008.

Approximately a week before trial, the parties received the results of the DNA test. The DNA analysis revealed that the dog was a mix of breeds, that the dog had a strong " 'guard-type breed' " component in its heritage, and that the breeds of American Staffordshire Terrier, Bull Terrier, and Bulldog also had this " 'guard-type breed' " component. The analysis also detected matches to Keeshond and Collie breed signatures, suggesting the dog had some nonguard group heritage also. The summary of analysis concluded that the strongest breed signature match was American Staffordshire Terrier with the other breeds having a lesser strength match.

After reviewing the DNA report, Lee filed a motion to continue the trial. In support of this motion, Lee argued he needed additional information from the DNA testing company in order to lay the proper foundation for introducing the test results at trial. The district court denied the motion.

Lee also filed a motion to dismiss before trial. In support of dismissal, Lee alleged the underlying municipal ordinance upon which the charge against him relied was unconstitutionally vague. Lee argued there existed no scientific meaning to determine whether a dog belongs to a particular breed or mixture and that the ordinance did not provide local law enforcement with objective standards to apply when enforcing the law. Lee maintained the vague nature of the ordinance required the court to dismiss the charge against him. The district court disagreed and denied the motion.

Retrial began on March 31, 2008. The State called numerous witnesses. Thompson from animal control testified regarding the breed of the dog. Thompson testified that characteristics of the

dog, such as the physical structure, are used to identify a dog's breed. She testified that a pit bull has the physical characteristics of a wedge-style shaped head, large jowls, thick neck, and is a muscular dog. Thompson observed that the dog found in McConnell's yard had a large, somewhat wedge-shaped head, thick neck, taller in the shoulder area, and his body tapered down shorter towards the back. She also observed that the dog had a shorter, pointed tail that was shorter than the body length. Based on all of these characteristics, Thompson identified the dog's breed as predominantly pit bull. Thompson concluded her testimony with her opinion that the dog was predominantly of the breeds listed in the municipal ordinance.

Dr. Swanson also testified as to the dog's breed. He testified that a dog's breed is determined by its phenotype, or what a dog looks like, such as the shape of the head, ears, mouth, muzzle, nose, length of body and legs, and musculature types. He testified that the breeds listed in the ordinance have large heads and powerful jaws, are muscular, show a waist going back to muscular rear legs, and have broad muzzles and ears that stand up naturally. Swanson testified that the dog found in McConnell's yard had the head of an American Staffordshire Terrier Pit Bull or Staffordshire Bull Terrier. The dog had a muscular front end, a narrow waist that went into muscular rear legs, a broad head, and a wide jaw set. Based on these characteristics, Swanson believed the dog had at least one parent that was American Staffordshire Terrier, Staffordshire Bull Terrier, or American Pit Bull Terrier. Swanson concluded by testifying that, in his opinion, the dog's physical characteristics were predominantly of the breeds listed in the municipal ordinance.

During the course of presenting its case, the State also introduced numerous photographs depicting the various injuries sustained by McConnell. Lee objected to the photographs on grounds that the prejudicial effect of the photographs on the jury outweighed any potential probative value. The district court overruled the objection.

The jury ultimately convicted Lee of involuntary manslaughter. Prior to sentencing, Lee filed a pro se motion alleging insufficient

evidence, prosecutorial misconduct, and ineffective assistance of counsel. In addition to this pro se motion, Lee's counsel also filed a motion for new trial or for judgment notwithstanding the verdict. Counsel argued that Lee's motion for continuance should have been granted, that the city's ordinance was unconstitutional, and that the evidence presented was insufficient to support a conviction. At a hearing on the motions, Lee chose not to present any argument in support of his pro se motion. The district court denied counsel's motion for a new trial without addressing Lee's pro se motion.

At sentencing, the district court granted Lee's motion for departure and imposed a sentence of 48 months in prison.

## ANALYSIS

On appeal, Lee claims the underlying municipal ordinance upon which his conviction for voluntary manslaughter relies is unconstitutionally vague. Lee also claims the district court erred in (1) denying his motion to continue the trial to retain a DNA expert; (2) giving an *Allen*-type instruction to the jury; (3) admitting into evidence autopsy photographs of the victim; (4) failing to rule on the merits of his motion for a new trial alleging ineffective assistance of trial counsel; and (5) using his criminal history without requiring it to be proven to a jury beyond a reasonable doubt. Lee further claims that even if each of these individual errors were deemed harmless, the cumulative errors denied him a fair trial.

*Lee's Claim that the Ordinance is Unconstitutionally Vague*

Lee claims that Kansas City, Kansas/Wyandotte County Municipal Ordinance Sec. 7-130 is unconstitutionally vague. The ordinance provides:

"(a) Unlawful to keep, exceptions. It shall be unlawful to keep, harbor, own or in any way possess within the city limits of the City of Kansas City, Kansas, any pit bull dog. 'Pit bull dog' is defined to mean:

(1) The Staffordshire bull terrier breed of dog;

(2) The American pit bull terrier breed of dog;

(3) The American Staffordshire terrier breed of dog;

(4) Any dog which has the appearance and characteristics of being predominantly of the breeds of Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, or any combination of any of these breeds."

Whether an ordinance is unconstitutionally vague is a question of law subject to unlimited review on appeal. This court presumes that the challenged legislation is constitutional and all doubts must be resolved in favor of the legislation's validity. *State v. Rupnick,* 280 Kan. 720, 736, 125 P.3d 541 (2005). It is the duty of the court to uphold the legislation under attack, if possible, rather than defeat it. If there is any reasonable way to construe the legislation as constitutionally valid, this court should construe it in that manner. *State v. Martis,* 277 Kan. 267, 298, 83 P.3d 1216 (2004).

Kansas courts use a two-part test to determine whether an ordinance is unconstitutionally vague and in violation of due process. First, we consider whether the ordinance conveys a sufficiently definite warning and fair notice of the proscribed conduct when measured by a common understanding and practice. *Rupnick,* 280 Kan. at 737. Second, the court considers whether the ordinance adequately guards against arbitrary and discriminatory enforcement by providing explicit standards for its enforcement. 280 Kan. at 737.

In support of his constitutional challenge, Lee argues the word " 'predominantly' " as used in the ordinance is vague, and the ordinance does not provide any criteria for use in determining whether a dog's appearance qualifies it as one of the breeds listed in the ordinance. We disagree.

Relevant to Lee's argument, the ordinance at issue here makes it unlawful to keep, harbor, own, or in any way possess within city limits a dog "which has the appearance and characteristics of being predominantly of the breeds of Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, or any combination of any of these breeds." Sec. 7-130(a)(4). Lee asserts a reasonable person reading this ordinance would be unable to adequately quantify the word "predominantly" as used in the statute. Lee further asserts the imprecise nature of the word was exacerbated in this particular case because Thompson and Swanson provided the jury with different definitions.

In support of these assertions, Lee cites to *Hearn v. City of Overland Park,* 244 Kan. 638, 772 P.2d 758, *cert. denied* 493 U.S. 976 (1989). In *Hearn,* the plaintiffs sought to enjoin the City of

Overland Park from enforcing an ordinance regulating the ownership of pit bull dogs within the city. The plaintiffs were 13 residents who owned dogs kept within the city. The plaintiffs argued the ordinance was unconstitutionally vague and overbroad, but our Supreme Court rejected this argument. 244 Kan. at 638. Although the language of the ordinance in *Hearn* is identical to the ordinance in the present case, Lee argues the Supreme Court's decision to uphold the ordinance was based on rules adopted by the Overland Park Police Department to assist in interpreting and implementing the ordinance. Notably, the rules specifically defined "predominantly" in the context of the ordinance:

" '. . . the officer has knowledge through identification procedures, admission by owner, keeper, or harborer, or otherwise that the animal is more than fifty percent pit bull. Predominantly shall further mean that the animal exhibits the physical characteristics of a pit bull more than that of any other breed of dog. If an officer cannot determine the predominant breed of the animal in question as pit bull, the animal shall not be subject to the provisions of [the ordinance] unless the animal is later positively identified as a pit bull by a licensed veterinarian.' " 244 Kan. at 643.

Lee relies on *Hearn* to argue that the ordinance in this case is unconstitutionally vague because, unlike the ordinance upheld by the Supreme Court in *Hearn*, there is no rule or directive to provide a mathematical definition of "predominantly" as that word is used in the ordinance. But there is no constitutional requirement that legislation be written with mathematical certainty to be enforceable. See *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The only requirement related to vagueness is that the legislation convey a sufficiently definite warning and fair notice of the proscribed conduct when measured by a common understanding and practice. *Rupnick*, 280 Kan. at 737. In other words, the ordinance is constitutional if it gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. 280 Kan. at 739.

Significantly, the word "predominantly" is not a legal term of art; it is a common term used as an adverb and defined by the dictionary to mean "for the most part" or "mainly." See Merriam-Webster's Deluxe Dictionary 1440 (10th Collegiate Edition 1998).

Using the common meaning of this term, the municipal ordinance at issue here makes it unlawful to keep, harbor, own, or in any way possess within city limits a dog "which has the appearance and characteristics of being [mainly or for the most part] of the breeds of Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, or any combination of any of these breeds." See Sec. 7-130(a)(4). The expert testimony provided by Thompson and Swanson was consistent with this definition. Both agreed that phenotypes, or physical characteristics, are used to identify a dog's breed and that the characteristics are recognizable upon visual observation. Moreover, both agreed on the types of physical characteristics that are consistent with the breeds listed in the ordinance. Finally, both agreed that Lee's dog had the appearance and characteristics of being predominantly of the breeds listed in the ordinance.

Upon consideration of the facts presented and the applicable law, we find the ordinance provides a person of ordinary intelligence with reasonable opportunity to know what conduct is prohibited. Notwithstanding such a finding, Lee alleges the ordinance is still unconstitutionally vague because, under it, a dog owner is unable to determine upon visual observation whether his dog is mainly or for the most part of the listed breeds. But Lee confuses an issue of fact with an issue of law. Whether the ordinance provides clear notice of the proscribed conduct is a matter of law. If the notice is clear, the issue of whether a certain dog falls within the purview of that ordinance is a matter of fact that can be resolved by, for example, reviewing literature, visually observing physical characteristics, or consulting with a veterinarian or breeder.

Significantly, the facts presented here are virtually indistinguishable from the facts in *Hearn*. The language used in both ordinances is identical and, whether by administrative rule or common understanding and practice, the word "predominantly" as used in the ordinance means that the dog has the appearance and characteristics of being mainly or for the most part of the breeds listed. Given the holding in *Hearn*, the common meaning of the term "predominantly" as used in the ordinance, and the existence of

physical characteristics that make the breed of these dogs recognizable upon visual observation by an owner, veterinarian, or breeder, we conclude as a matter of law that the ordinance sufficiently conveys a definite warning and fair notice of the proscribed conduct and adequately guards against arbitrary and discriminatory enforcement. In light of this finding, there is no merit to Lee's claim that the municipal ordinance is unconstitutionally vague.

*Lee's Claims of Trial Error*

(1) *Lee's Motion to Continue Trial*

Lee filed a motion to continue trial so he could retain an expert to explain the DNA test results. Lee argues that the district court's decision to deny this motion violated his constitutional right to present a defense.

A district court may grant a continuance to either party for good cause shown. K.S.A. 22-3401. The decision to continue a criminal case lies within the sound discretion of the district court. *State v. Stevens*, 285 Kan. 307, 322-23, 172 P.3d 570 (2007). This is true even if the defendant claims that denying a continuance would interfere with his or her constitutional right to present a defense. *Cf. Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) (holding, in context of constitutional right to assistance of counsel, that "broad discretion must be granted trial courts on matters of continuances" and that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' " violates rights guaranteed by constitution).

On appeal, the district court's decision to deny a motion to continue trial will not be disturbed absent a showing that the court abused its discretion. The defendant bears the burden of establishing such an abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1226, 221 P.3d 561 (2009). The standard used to determine whether a district court has abused its discretion varies depending upon the character of the question presented to the court for decision. Generally, a discretionary decision made by the court is protected if reasonable persons could differ upon the propriety of the decision. However, a district court may be found to have abused its discretion if the decision failed to take into account the

applicable legal standards. *State v. Edgar*, 281 Kan. 30, 38, 127 P.3d 986 (2006).

When a request for a continuance has been made in order to secure attendance of a witness at trial, the factors relevant to a decision regarding that request include: the possible prejudice to the defendant, the diligence or lack thereof in attempting to secure the attendance of the witness, the materiality and importance of the probable testimony, and the probability of the witness' appearance at a later date if the continuance is granted. *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976).

Having determined the proper standard of review and the applicable standard of proof, we now turn to the circumstances surrounding Lee's request to continue the trial. As noted above, the jury was unable to reach a verdict at Lee's first trial. Prior to the beginning of the second trial, the State filed a motion for a continuance to obtain DNA testing from a company named Mars Veterinary for purposes of determining the dog's breed. Lee did not object to the continuance. The court granted the State's request to continue the trial, finding that one of the key issues was the breed of the dog. The trial was continued to March 31, 2008.

On March 25, 2008, the State received the results of the DNA test. Neale Fretwell of Mars Veterinary authored the report. The report stated:

"It is clear that the computer analysis suggests that this tested dog is a mix of breeds rather than one of the pure breeds our test is able to detect, and that the dog has a strong 'guard-type breed' component to its heritage, as our composite guard signature is matched strongly in the detailed analysis and this is reflected in the reported breeds of American Staffordshire, Bull terrier and Bulldog. The computer also detects matches at a number of markers to Keeshond and Collie breed signatures suggesting that this dog has some non guard group heritage too.

"The summary of the detailed analysis is that the strongest breed signature matched is American Staffordshire Terrier and this is reflected in the report, with the other breeds having a lesser strength match across the whole set of markers. The matches to Keeshond and Collie are slightly stronger than the Bull terrier and Bulldog matches, but not by a large order of magnitude. Both Collie and Keeshond show strong matches to some chromosome windows but not all suggesting that these breeds are present in the dog's lineage at the equivalent of either Grandparent or Great Grandparent level."

The report further stated that the dog's "ancestry contains some American Staffordshire Terrier (AST) and also includes distant traces of Bull Terrier (BLT), Bulldog (BD), Collie (COL) and Keeshond (KEE)." The graphic report reflected a significant amount of American Staffordshire Terrier and Keeshond.

Attached to the report was an email received by the State from Shelia Dodson, the medical director for No More Homeless Pets KC. In the email, Dodson informed the State that there is a strong " 'guard-type' " heritage to the dog. Dodson agreed that there "appeared to be predominantly [guard-type] involved."

On March 30, 2008, the day before trial, Lee filed a motion to continue the trial. Lee argued that the material contained in the report could be considered favorable to the defense on the issue of breed identification but that he had no means to introduce the evidence at trial without further foundation. Lee noted that the State was able to contact a representative of Mars Veterinary, but that there was no clarification of the material contained in the report. Lee further noted that the State left messages for the veterinarian who sent the DNA sample to the testing company, but the veterinarian did not return the calls. Finally, Lee noted that defense counsel attempted to contact Dodson to follow up on her email to the prosecutor, but he received no response.

The district court denied the motion for continuance, stating:

"[W]hat I haven't heard from either of you at this point is that you've had a conversation with this lab or anyone at this lab and they've indicated a willingness to come to Kansas City and testify. You've both had this for a week and I know you've both attempted to get in touch with them.

. . . .

 ". . . I see no reason to believe that these folks would testify for either side. And based upon that, I don't see a basis for me continuing this case. This matter has been pending for a year and half at least—more than a year and a half. And I think we need to go ahead and resolve it.

"So, I'm going to—without any indication of a willingness or availability of an expert to testify in any meaningful way about this case, I'm going to deny the motion to continue."

Based on the factors set forth in *Howard,* we find the district court did not abuse its discretion here. The parties agree that they

both diligently and repeatedly attempted to contact Dodson and a representative from Mars Veterinary to get an explanation of the results of the DNA test but that these attempts proved unsuccessful. After a week of attempting to secure a witness, there still was no indication that someone from Mars Veterinary was willing to testify at trial regarding the DNA test results. Thus, it is highly unlikely that such a witness would appear at a later date if the continuance was granted.

The evidence here also supports the district court's finding that, even if a witness was willing to testify, the probable testimony was not critical to establish Lee's theory of defense. As a preliminary matter, the information in the report does not support a finding that the dog falls outside the purview of the ordinance. The ordinance prohibits dogs that have "the appearance and characteristics of being predominantly of the breeds of Staffordshire bull terrier, American pit bull terrier, American Staffordshire terrier, or any combination of any of these breeds." See Sec. 7-130(a)(4). Although the report states that the dog was a mix of breeds, the analysis specifically detected the breeds of American Staffordshire Terrier, Bull Terrier, and Bulldog. To that end, the report indicates that although the dog matched strongly to American Staffordshire Terrier and Bull Terrier, the strongest breed signature match was American Staffordshire Terrier. Because the report itself did not favor Lee's theory of defense, we find it unlikely that any proposed testimony about the report would do so.

Moreover, the information in Dodson's email does not support a finding that the dog falls outside the purview of the ordinance but instead supports the State's theory that Lee's dog fell within subsection (4) of the ordinance. More specifically, Dodson's email stated that the dog had "predominantly" a "guard-type" heritage that generally is reflected in the breeds of American Staffordshire Terrier, Bull Terrier, and Bulldog. Because the substance of her email did not favor Lee's theory of defense, we find it unlikely that any proposed testimony about the email would do so.

We find the district court applied the proper legal standard in deciding to deny Lee's motion to continue and that reasonable

persons could agree with this decision; thus, the district court did not err in denying a continuance.

### (2) Allen-*Type Instruction*

Lee asserts the district court erred when it gave an *Allen*-type instruction to the jury before deliberations began. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Lee did not object to the instruction; therefore, this court reviews the instruction under a clearly erroneous standard. See K.S.A. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Carter*, 284 Kan. 312, 324, 160 P.3d 457 (2007).

The district court gave the following jury instruction:

"Like all cases, this is an important case. If you fail to reach a decision, the charge is left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge to a different jury at a later time. *Another trial would be a burden on both sides.*

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." (Emphasis added.)

The Kansas Supreme Court specifically has addressed the language at issue in several recent cases. In *State v. Salts*, 288 Kan. 263, 265, 200 P.3d 464 (2009), the court held that the language " '[a]nother trial would be a burden on both sides' " is erroneous because it is misleading and inaccurate. Yet the *Salts* court went on to determine that the error did not support reversal because the instruction was given before the jury deliberated, the instruction was included with all the other jury instructions, and the defendant did not object to the instruction. Under these facts, the *Salts* court determined there was no real possibility the jury would

have rendered a different verdict if the error had not occurred. 288 Kan. at 264-67.

In *State v. Ellmaker*, 289 Kan. 1132, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010), our Supreme Court again acknowledged that the challenged language was error, finding it was misleading and inaccurate. But the court again found that there was no real possibility the jury would have returned a different verdict without the error. 289 Kan. at 1146-47.

Most recently, in *State v. Colston*, 290 Kan. 952, 976-78, 235 P.3d 1234 (2010), the court confirmed its holding in *Salts* and *Ellmaker*, finding that the giving of the *Allen*-type instruction to the jury prior to deliberations was error, but not reversible error.

Notwithstanding this precedent, Lee argues the language "another trial would be a burden on both sides" is reversible error here because in his case there is a real possibility the jury would have rendered a different verdict without that language. Specifically, Lee argues there was a serious question presented at trial regarding whether the dog involved was subject to the ordinance.

As Lee points out, the central issue at trial was whether the dog fell within the purview of the ordinance. Thompson, who had completed breed identification training, testified that breed identification is done by the characteristics and structure of the animal. Thompson testified that with pit bulls, the size of the dog's head, the shape, and the body structure are considered in identification. She testified that a pit bull usually has a wedge-style shaped head, large jowls, a thick neck, and is very muscular. Thompson testified that the dog in this case had a wedge shape head, a thick neck, and his structure tapered down shorter toward the back. She testified that the dog also had a shorter, pointy tail. Based on these characteristics, she considered the dog predominantly a pit bull.

Dr. Swanson testified that he also received training in breed identification. He testified that a dog's phenotype is used when identifying its breed. He explained that the shape of head, ears, mouth, nose, body length, leg length, and musculature types are considered. Thompson testified that he was familiar with the phenotypes of the breeds listed in the ordinance. He testified the breeds in the ordinance have a large head, powerful jaw, large

muzzle, a narrow waist, muscular front end, and muscular rear legs. He further testified that the breeds have short, bristly hair and a tail that stands straight out. He testified that the dog in this case had the head of an American Staffordshire Terrier Pit Bull or Staffordshire Bull Terrier. The dog also had a muscular front end, a narrow waist that went into muscular rear legs, and a wide set of jaws. In his opinion the dog fell within the purview of the ordinance.

Both Thompson's and Swanson's testimony established that breeds are identified by phenotypes, or physical characteristics. Both were in agreement as to the characteristics of the breeds listed in the ordinance, and both testified that the dog displayed these characteristics. Based on the testimony of these witnesses, the evidence that the dog fell within the purview of the ordinance was substantial.

The instruction Lee complains about was given before the jury deliberated and was included with all the other instructions. Lee did not object to the instruction. The evidence that the dog fell within the purview of the ordinance was substantial. This case is similar to *Salts*, *Ellmaker*, and *Colston* regarding the effect of the erroneous instruction. We simply are not persuaded there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.

### (3) *Photographs Depicting the Victim's Injuries*

Next, Lee claims the district court erred in overruling his objection when the State sought to introduce Exhibits 56, 57, and 66 into evidence. Specifically, Lee argues any probative value of the photographs is substantially outweighed by the risk of unfair prejudice against him by the jury.

Exhibits 56, 57, and 66 are autopsy photographs depicting the victim's injuries. Exhibit 56 is a photograph of McConnell's abdomen. The photograph shows loss of skin and tissue under the skin. The photograph shows numerous scrape marks that blend together. Exhibit 57 is an up-close photograph showing the margins of tissue loss and the tearing of the tissue. The photograph shows that the tissue had not been cut out or sliced, but instead grabbed

and torn. Exhibit 66 is a photograph of the wounds and marks on the back of McConnell's legs. The photograph shows a white sheet under McConnell covered in blood as well as a large pool of blood under her legs.

The district court has broad discretion regarding the admission of demonstrative photographs. *State v. Crum*, 286 Kan. 145, 159, 184 P.3d 222 (2008). Generally, all relevant evidence is admissible. *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Regarding relevance, our Supreme Court "has repeatedly held that the admission of photographs of a decedent, including photographs taken during an autopsy, is not error where the photographs are relevant to matters in issue, such as the fact and manner of death or to assist in understanding a pathologist's testimony." *State v. Randol*, 212 Kan. 461, 466, 513 P.2d 248 (1973); see, *e.g.*, *State v. Warledo*, 286 Kan. 927, 946, 190 P.3d 937 (2008); *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004). Nevertheless, the admission of such photographs is error when the photographs do not help explain or supplement testimony but instead only "inflame the minds of the members of the jury." *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

Once relevance is established, a district court has the discretion to exclude photographic evidence if the probative value of the photographs is substantially outweighed by the risk of unfair prejudice, or if the photographs are unduly repetitious and cumulative. See *Cavaness*, 278 Kan. at 478. When, as here, the defendant objected to the photos as unduly prejudicial, the appellate court will review for abuse of discretion. See *Riojas*, 288 Kan. at 387. Discretion is abused only when no reasonable person would take the view adopted by the district court; the burden of proof is on the party alleging that such discretion has been abused. *Cavaness*, 278 Kan. at 478.

At trial, cause of death was an issue of fact presented to the jury for determination. The pathologist testified that the results of the autopsy revealed McConnell was alive during the dog attack. Specifically, bites on both the front and back side of McConnell's body

indicated she was moving around rather than lying still and flat during the attack. The pathologist also testified that the force of the attack imposed a tremendous amount of stress on McConnell and that the stress to which she was subjected caused her to suffer a heart attack. Notwithstanding this testimony, Lee argued to the jury that other stresses could have caused McConnell to suffer a heart attack, including her use of a rototiller.

Given that the cause of death was an issue in dispute at trial, we find the photographs depicting McConnell's injuries were relevant to show that the dog attack was severe enough to produce a level of stress on McConnell's heart sufficient to cause her death. Exhibits 56 and 57 show the attack as being so brutal that the dog bit through McConnell's skin to her tissue, which supplements the pathologist's testimony that the dog attack caused enough stress to cause McConnell to suffer a heart attack. The photographs show that this was not just a minor dog bite but a vicious attack that likely caused major stress, unlike the stress that would be associated with use of a rototiller as Lee suggested. Moreover, the photograph showing injuries to the back of McConnell's legs established that she changed positions while being attacked, which supported testimony that she was alive at the time. The photographs of McConnell's wounds in Exhibits 56, 57, and 66 supplemented the testimony of the pathologist and assisted in his explanation that the cause of death resulted from the stress of the attack, not from the stress of another event.

In addition to cause of death, identity of the dog involved in the attack also was an issue of fact presented to the jury for determination. The State asserted it was Lee's stray dog that attacked McConnell. The defense alleged that a different stray dog in the neighborhood or Lee's other dog could have attacked McConnell. Stark, a firefighter, testified that when he arrived he observed Lee's stray dog standing either between or on McConnell's legs and biting from the inner thigh area. The paramedic also testified that he observed Lee's dog on top of McConnell attacking her. He testified that it looked like the dog was partially straddling McConnell with its face in McConnell's lower abdomen. Notably, the photographs of McConnell's abdomen injuries, Exhibits 56 and 57, supplement

the testimony of Stark and the paramedic that the dog was standing on top of McConnell and biting her near her lower abdomen area. These photographs place the stray dog Lee kept at his house near the victim and corroborates the State's case that the dog Lee identified as the stray dog that had been at his home was the dog that attacked McConnell.

There is no question that the photographs presented to the jury were gruesome and possibly prejudicial to Lee as a defendant. Based on the facts set forth above, however, we agree with the district court that the probative value associated with the photographs outweighs the potential for undue prejudice. The photographs do not distort the reality of the attack, and there is no suggestion that the State sought to admit them for the sole purpose of inflaming the passion of the jurors. The photographs were relevant, served to illustrate the nature and extent of the wounds inflicted, and tended to supplement witness testimony that McConnell's heart attack was brought on by the stress of the attack and that it was Lee's dog that was involved. Because a reasonable person could have found the probative value of the photographs outweighed the potential for undue prejudice, we cannot say the district court erred in so finding.

### (4) *Motion for New Trial*

Following his conviction, Lee filed a pro se petition to review the arrest of judgment. Lee alleged, among other things, that trial counsel was ineffective for denying Lee access to any discovery, failing to make objections during trial, and failing to provide expert witnesses at trial. Lee requested a new trial. Defense counsel also filed a separate motion for new trial.

At sentencing the district court heard arguments regarding counsel's motion for new trial. The district court denied the motion. At that time, Lee's counsel addressed Lee's pro se motion:

"There has been a pro se motion for new trial filed on this filed [*sic*] by my client. I am inviting him to speak to you directly about it if he wants to and to argue it himself. I think because of the allegations in the motion, I may be ethically prohibited from arguing that. However, I talked with Derrick before we started the hearing today.

"And do you want to argue or not?

"It's my understanding he doesn't want to argue that motion at this time."

Given this response, the district court never ruled on Lee's pro se motion.

On appeal, Lee argues that the district court abused its discretion by failing to consider Lee's allegations of ineffective assistance of counsel. Lee asks this court to vacate his sentence, remand to the district court for an evidentiary hearing on his claims, and appoint conflict-free counsel. Because of the allegations in Lee's motion, we construe him to be appealing from the district court's decision to deny his motion for a new trial.

Before we can address the merits of Lee's argument, however, we first must determine whether we have jurisdiction to review Lee's challenge to the court's ruling on his posttrial motion for new trial. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Ellmaker*, 289 Kan. at 1147. Furthermore, an appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, it is the duty of the appellate court to dismiss the appeal. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008).

The right to appeal is purely statutory; it is not contained in the United States or Kansas Constitutions. Therefore, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statutes. *Ellmaker*, 289 Kan. at 1148. At the time Lee was convicted, a motion for a new trial on grounds other than newly discovered evidence had to be filed within 10 days after the verdict or within further time fixed by the district court during that 10-day period:

"A motion for a new trial based on the ground of newly discovered evidence may be made within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 10 days after the verdict or finding of guilty or within such further time as the court may fix during the 10-day period." K.S.A. 22-3501(1).

Although the district court has the discretion to extend the 10-day period, the 10-day time limit imposed by K.S.A. 22-3501(1) is not discretionary:

"K.S.A. 22-3501 requires a motion for a new trial be filed within 10 days of a 'verdict or finding of guilty.' It is discretionary for the trial court to grant an extension of time for this filing if such application for an extension was made within the 10-day statutory period." *State v. Torrance*, 22 Kan. App. 2d 721, 729, 922 P.2d 1109 (1996).

If the district court lacks jurisdiction to enter an order, an appellate court does not acquire jurisdiction over the subject matter on appeal. *State v. McCoin*, 278 Kan. 465, 468, 101 P.3d 1204 (2004).

Here, the jury returned its verdict on April 3, 2008. Under the statute, Lee had 10 days to file a motion for a new trial. Lee did not file his motion until May 7, 2008, clearly outside the 10-day period. There is nothing in the record to indicate Lee filed an application for extension of time to file the motion. Thus, the district court lacked the authority to consider Lee's untimely motion. Because the district court lacked authority to enter an order, this court does not have jurisdiction over the subject matter. See *McCoin*, 278 Kan. at 468.

### (5) *Calculation of Criminal History*

Lee challenges the district court's use of his prior adult convictions to calculate his criminal history score without requiring those convictions to be proven to a jury beyond a reasonable doubt. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Lee concedes this issue has been decided against him but includes it to preserve it for federal review. The Kansas Supreme Court rejected Lee's argument in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). We are duty bound to follow Kansas Supreme Court precedent absent some indication the court is departing from its previous position. *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004). There is no indication our Supreme Court is departing from its ruling in *Ivory*. See *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008) (affirming *Ivory*). Accordingly, Lee's argument fails.

### Lee's Claim of Cumulative Error

Finally, Lee claims he is entitled to reversal of his convictions based on the cumulative effect of trial errors.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citation omitted.] Moreover, this doctrine does not apply if no error or only one error supports reversal. [Citation omitted.]" *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

Because the record fails to support any of the errors raised on appeal by Lee, he is not entitled to reversal under a theory of cumulative error.

Affirmed.