NOT DESIGNATED FOR PUBLICATION

No. 114,476

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHN R. HARWOOD, JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Dickinson District Court; DAVID R. PLATT, judge. Opinion filed March 10, 2017. Affirmed.

*Korey Kaul* and *Joanna Labastida*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, for appellee.

Before HILL, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*: Claiming several trial errors and sentencing errors, John Harwood, Jr., appeals his conviction for aggravated criminal sodomy. After our review of the record and an analysis of the issues he raises, we hold that Harwood received a fair trial and affirm his conviction.

1

*Harwood was left in charge of his wife's daycare business.*

In 2012, Harwood worked as a deputy for the Dickinson County Sheriff's Department. His wife, Erin, ran an in-home daycare. If Erin had to be absent from the daycare, Harwood would watch the children. In May, Erin took their daughter on a school fieldtrip and left Harwood in charge. There were four children in his care that day. One we will refer to by her initials, L.P., who was 4 years old.

That evening, L.P.'s mother, Jessica, picked her children up from daycare and took them home. L.P.'s father, Mike, was already home when Jessica and the kids came in the door. With both parents in the vicinity, L.P. stated, "'John tried to put his pee-pee in my mouth.'" Mike and Jessica were stunned. They asked L.P. to repeat herself, which she did. They asked where Erin had been, and L.P. stated she was not there. Jessica made a few phone calls and reported L.P.'s disclosure to Marjorie Ruhl at Children's Mercy Hospital in Kansas City.

Ruhl told Jessica to bring L.P. in immediately for an exam. Ruhl also told Jessica not to bathe L.P. or brush L.P.'s teeth and to bring in L.P.'s clothing. Ruhl called police dispatch. Mike and Jessica did not take L.P. to the hospital that night, but they took her the next night.

The morning after L.P.'s disclosure, Jessica went to Harwood's residence and informed Harwood and Erin what L.P. had said. Jessica left. Harwood then went into the playroom and checked over L.P.'s bedding. He picked up her blanket and looked it over. Erin asked him what he was doing. Harwood then went to the laundry room, pulled out the clothes he had worn the day before, and looked them over. Erin again asked him what he was doing. Harwood went upstairs to take a shower. Erin followed and told him not to get in the shower, but instead to go the hospital and have a rape kit performed. Harwood

2

showered. Later that day, Harwood washed the clothes he had been wearing the day before.

After stopping at the Harwood's home, Jessica drove to see her mother, Kelly, at Kelly's place of business. L.P. went inside first; Jessica was outside on her cell phone. When Kelly asked L.P. what she and her mother were doing today, L.P. looked at Kelly and said, "'Grandma, John put his pee-pee in my mouth.'"

The case was handed over to Detective Jason Wilkins with the Abilene Police Department. That afternoon, Detective Wilkins spoke with Jessica and Mike at their home, collected L.P.'s clothing, and made arrangements for L.P. to be interviewed.

That same evening, Mike and Jessica took L.P. to Children's Mercy Hospital in Kansas City, Missouri, to be examined. Deanna Curran, R.N., swabbed L.P.'s mouth.

Detective Wilkins interviewed L.P. The interview was video recorded and played at trial. About 17 minutes into the interview, L.P. had not brought up John or the sexual abuse allegation. Detective Wilkins told L.P. that he had heard that L.P. told her mom someone had tried to put their pee-pee in her mouth. L.P. immediately said, "'John did that. John did.'" She stated John was her babysitter. When questioned further, L.P. elaborated that she was in the playroom at naptime and John tried to stick his pee-pee in her mouth and he wiped it on her shirt. She said that at the time Erin was on a trip. She said the other two children were asleep.

During the trial, L.P. testified that John stuck his "private part" in her mouth. She could not identify John as being in the courtroom at trial. There was testimony that Harwood appeared different at trial than he did in May 2012. He was skinnier and had different facial hair.

3

L.P.'s clothing and the swab from her mouth were submitted to the KBI for testing. Amanda Misencik, a forensic scientist for the KBI, identified seminal fluid on the oral swab and the shirt that L.P. had been wearing on that day. She located five sperm heads on two small cuttings of the shirt. The sperm was nonmotile, meaning the sperm did not have tails. She located one sperm head on the oral swab.

Dawn Ford, a forensic biologist for the KBI, performed DNA testing on the shirt and oral swab. Ford found an equal mixture of DNA from L.P. and Harwood on the shirt. There was also a minor contribution from a third person, but there was insufficient information to identify the third person. Because a mixture of DNA was found, Ford testified she could not say the DNA was a "match," but Harwood could not be excluded as a contributor to the stain on L.P.'s shirt. She performed a statistical analysis of the likelihood that the contributor could be anyone else. Ford could not determine what bodily fluid source the DNA came from. No DNA results were obtained from the sperm cells on L.P.'s shirt. The oral swabs contained L.P.'s DNA and a partial minor DNA profile, but there was insufficient information to identify the minor profile.

Dr. Brian Smith, a urologist, testified that he performed a vasectomy on Harwood in April 2010. In June 2010, Dr. Smith performed a semen analysis and determined Harwood was still ejaculating some sperm. In July 2010, Smith performed another semen analysis. The result was negative, meaning he saw no sperm or one or less sperm per high powered field.

Dr. Smith testified that negative does not necessarily mean zero. A normal quantity of sperm is 20 million to 120 million per milliliter. But 100,000 nonmoving sperm is normal postvasectomy. He testified it is possible for a postvasectomy male to ejaculate nonmotile sperm. He did not know whether it was possible for a postvasectomy male to ejaculate nonmotile sperm 2 years after the vasectomy. Based on literature he has read, it is common for a vasectomized male to still be ejaculating nonmotile sperm 6

4

months after a vasectomy. New sperm is not ejaculated, but any sperm that is still left in the vas deferens would be ejaculated.

Dr. Apostolo Evangelidis, a urologist, testified that there could be nonmotile sperm present indefinitely following a vasectomy if certain conditions are met. The less ejaculations that a postvasectomized male has, the higher the chance that nonmotile sperm will still be present postvasectomy. He testified that ejaculate contains nucleated cells with DNA other than sperm cells.

Joy Reyes, a medical technologist at Salina Regional Health Center, performed a semen analysis on Harwood in November 2013 and did not see any sperm.

The jury convicted Harwood as charged. The trial court denied Harwood's departure motion and sentenced him to life in prison without the possibility of parole for 25 years.

In his appeal, Harwood raises several trial and procedural errors. He claims the court abused its discretion by allowing several witnesses to recount what L.P. had told them. He thinks the court should have continued closing arguments until the following day because his attorney was ill. Harwood also contends the court should have continued his sentencing hearing to allow his expert witness to testify. He also argues that Judge Platt should have recused himself from this case. Next, he argues that it was erroneous to admit his ex-wife's testimony because it violated the marital privilege. Additionally, Harwood claims that the court erred by giving the jury an incorrect elements instruction. Finally, Harwood suggests that all of these errors, when added together, compel us to reverse his conviction and remand for a new trial. We will address the issues in that order.

*Admitting what L.P. told several other people about Harwood was not erroneous.*

Harwood objected at three different times during the trial to the evidence about L.P.'s disclosure to other people that Harwood put his "pee-pee" in her mouth. L.P. also testified that Harwood stuck his private part in her mouth. His objections were either hearsay or cumulative. The trial court overruled the objections. Harwood contends the court improperly admitted bolstering and cumulative evidence.

We list the three objections Harwood made.

- Mike, L.P.'s father, testified over Harwood's objection that L.P. told him that John put his pee-pee in her mouth. Harwood objected to the testimony as hearsay and said that the better practice was to put L.P. on the stand before Mike testified.
- Deanna Curran, the nurse examiner, testified over Harwood's objection that L.P.'s mom, Jessica, advised her that L.P. said "'John tried to put his pee-pee in my mouth.'" Harwood objected to the testimony as cumulative, repetitive, and hearsay.
- A video of L.P.'s interview with Detective Wilkins was admitted over Harwood's objection and played for the jury. Harwood objected, arguing that L.P. had already testified and the video was cumulative and a "repeated attempt to the credibility of the witness." Harwood cited *State v. Kackley*, 32 Kan. App. 2d 927, 935, 92 P.3d 1128 (2004), as support.

Other witnesses testified about L.P.'s disclosure without an objection. Jessica testified that she heard L.P. say that "'John tried to put his pee-pee in my mouth.'" Marjorie Ruhl and Erin Harwood both testified that Jessica related the same statement to them. Kelly, L.P.'s grandmother, testified that L.P. said "'Grandma, John put his pee-pee in my mouth.'"

6

We note that Detective Wilkins testified, over a hearsay objection, that Kelly related the statement to him.

Harwood complains that the trial court improperly admitted cumulative and bolstering evidence. We will only consider Harwood's properly preserved objections to cumulative evidence because K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge in the absence of a timely and specific objection made on the record. See *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016). A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *State v. Page*, 303 Kan. 548, 558, 363 P.3d 391 (2015).

We turn now to the law. Cumulative evidence is "'evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect.'" *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 (2012). This court reviews the question of whether evidence is cumulative for an abuse of discretion. 295 Kan. at 1156. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). The trial court has the discretion to limit the number of witnesses on a single issue and to determine where the line should be drawn for the number of witnesses permitted. *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982). Our Supreme Court has found no error in permitting two witnesses for the prosecution to give cumulative testimony on the same subject to impeach the defendant's testimony if the testimony was relevant. *Johnson*, 231 Kan. at 156-57. "Cumulative evidence in itself is not objectionable. Error cannot be

7

predicated on allowing the use of such evidence." *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996).

But Harwood's complaint is not simply that the evidence was cumulative. Harwood cites *Kackley*, 32 Kan. App. 2d at 927—a child sex crime case—which discussed cumulative or repetitious testimony in the context of a hearsay rule. Kansas adheres to the general rule that prior statements of a witness, consistent with his or her own testimony at trial, are not admissible in corroboration of the witness' testimony unless the witness has been impeached and, then only for the purpose of rehabilitation. *State v. Whitesell*, 270 Kan. 259, 290, 13 P.3d 887 (2000). The reason for this rule is that a witness' story is not made more probable or trustworthy by the number of repetitions of it. *Kackley*, 32 Kan. App. 2d at 935 (quoting 4 Wigmore on Evidence § 1124 [Chadbourn rev. 1972]). Thus, testimony of a witness cannot generally be bolstered by showing the witness made prior consistent out-of-court statements.

But there is an exception to the rule for rape prosecutions. In rape cases, the fact that the victim made a complaint shortly after the offense can be introduced through the testimony of other witnesses. Evidence of the victim's complaint may be introduced through other witnesses for the express purpose of corroborating the victim's testimony, but not as independent evidence of the offense charged. The reason for the exception is that the failure of a rape victim to complain, or of a delay in making the complaint, tends to discredit the victim's testimony. *State v. Washington*, 226 Kan. 768, 770, 602 P.2d 1377 (1979). In *Kackley*, 32 Kan. App. 2d at 934-35, this court extended the rule to child sex abuse cases. The court noted that admission of repetitious testimony is characteristic in child sex crime prosecutions and generally draws no objection.

The rationale for the *Kackley* exception seems particularly true where the victim is a 4-year-old child and the defense is implicitly, if not explicitly, that the child made up

the allegation. The failure of the child to immediately and consistently report the allegation could tend to discredit the child.

In *Kackley*, two witnesses were permitted to testify to A.G.'s story before A.G. testified. The State first called A.G.'s mother, who relayed A.G.'s report of the incident. The State then called the investigating officer, who related A.G.'s report of the incident. The defense objected to the testimony as cumulative. A.G. also gave her account of the incident. On appeal, Kackley argued that the cumulative testimony improperly bolstered A.G.'s testimony. This court concluded that the district court did not abuse its discretion in admitting the cumulative testimony and, if it was error, it was harmless. 32 Kan. App. 2d at 934-36.

Here, Harwood objected to Mike's testimony regarding L.P.'s initial disclosure, Curran's testimony regarding L.P.'s initial disclosure, and the video of L.P.'s interview with Detective Wilkins. But evidence that L.P. made the same allegation to her parents on the first day and then to Detective Wilkins a few days later was admissible to corroborate L.P.'s testimony at trial under *Kackley*. Kansas allows corroborating and cumulative testimony in child sex offense cases.

Several unpublished cases support this view. In *State v. Hansen*, No. 93,873, 2006 WL 1520538, at *2 (Kan. App. 2006) (unpublished opinion), a panel of this court held that a recorded interview of the 4-year-old rape victim "clearly falls within the exception to the admission of prior consistent statements noted in *Kackley*, especially because K.F. was only 4 years old at the time of the rape and because the defense theory involved a categorical denial."

Similarly, L.P.'s recorded interview falls within the *Kackley* exception. The video was evidence that L.P. had made the complaint against Harwood within days of the crime

9

and corroborated L.P.'s testimony at trial. L.P. was 4 years old at the time of the crime. The defense theory was either the crime did not happen or someone else did it.

More recently, in *State v. Johnson*, No. 107,086, 2013 WL 5303512, at *5-6 (Kan. App. 2013) (unpublished opinion), during a rape trial, the nurse examiner testified that it was customary to ask questions about what happened to bring the victim to the hospital. Johnson objected to the nurse examiner relating the events of the sexual assault as had been relayed to her by the victim. Johnson claimed it was cumulative because the victim and two police officers had testified to the events of that night. Citing *Kackley*, a panel of this court held that the district court did not abuse its discretion in admitting the nurse examiner's testimony. The nurse examiner's testimony about what the victim related had happened was not admitted as independent evidence of the rape. Rather, hearing the victim's story was a regular step in the completion of the sexual assault examination.

Similarly, in this case, Curran testified that she customarily obtains a history of her patients to guide her exam. Here, she spoke with L.P.'s mother, Jessica. She testified that Jessica related what L.P. had said. She testified that she used L.P.'s words to guide her exam. She took swabs of certain places on L.P.'s body because of the history that was given to her. Curran's testimony about what L.P. had said was not introduced as independent evidence of the aggravated criminal sodomy.

We hold the trial court did not abuse its discretion by overruling Harwood's objections to cumulative evidence.

*We find no abuse of discretion when the court refused to continue the trial.*

When both sides rested, defense counsel asked the court to recess for the day before closing arguments. She stated, "I need some additional time just to collect my thoughts, notes." The court denied her request. Defense counsel then stated that she had

10

"been under the weather the last two days and would like to have a fresh start in the morning." The court then called for a short break, but proceeded with closing arguments that day. Harwood argues the trial court abused its discretion by denying Harwood's motion for a continuance. Granting such a motion is, of course, within the discretion of the trial court. *State v. Lewis*, 299 Kan. 828, 846, 326 P.3d 387 (2014).

Here, the record indicates that defense counsel "did not feel well" and was "under the weather." There is no other information on the extent of her illness that can be discerned from the record. Defense counsel was certainly not hospitalized and was able to appear in court. Defense counsel proceeded with the evidence portion of the trial despite her illness and was afforded breaks when needed. The trial court was in the best position to observe defense counsel and determine whether her illness would interfere with her ability to give a closing argument. This court did not observe defense counsel and we cannot say that no reasonable person would have denied her request for a continuance under these circumstances.

We do recognize, however, that the circumstances here are much different than those in the Nevada Supreme Court case cited by Harwood—*Bongiovi v. Sullivan*, 122 Nev. 556, 570, 138 P.3d 433 (2006). In *Bongiovi*, the defendant's attorney was hospitalized for heart problems. Defendant requested a continuance of the trial until the attorney had recovered. The district court continued the trial for 7 days so that the attorney's law partner could get up to speed on the case. The law partner requested another continuance, claiming he was unable to prepare for trial in time. The district court denied the request. The Nevada Supreme Court stated that an attorney's illness is good grounds for a continuance. But the court found no abuse of discretion in the trial court's actions. 122 Nev. at 569-70.

We find no abuse of discretion on this point.

11

*Because the expert's report was admitted into evidence, we find no abuse of discretion in denying a continuance of the sentencing hearing.*

Harwood asked the court to continue sentencing because two witnesses—Dr. Stanley Mintz and Marilyn Fronk—were unavailable on the sentencing date. Harwood's departure motion was heard at the same time. At the sentencing hearing, Harwood asked the court to continue the hearing because Dr. Mintz was still unavailable. Defense counsel stated that Dr. Mintz performed an evaluation of Harwood and Dr. Mintz' testimony would be supportive of Harwood's motion for a departure.

Counsel argued that, if present, Dr. Mintz could "explain his credentials, his education, his training, and the steps he went through in the evaluation process of Mr. Harwood, as well as the recommendations and conclusions of the evaluation." The court denied the motion to continue sentencing. The court, however, admitted into evidence Dr. Mintz' psychosexual evaluation.

Harwood's other witness, Marilyn Fronk, did testify at the departure motion/sentencing hearing. She testified she was employed as a therapist with Clinical Associates. Fronk met with Harwood and assessed his need for treatment and his risk level. Fronk testified that Harwood was capable of participating in treatment; he had symptoms of severe depression; he did not accept responsibility for his offense or believe he needed treatment; he believed victims of sexual abuse lie and did not believe anyone was hurt by his offense; he had a low risk of recidivism according to the Static-99 test; he had a high risk of sexual and violent recidivism according to the Acute 2007 assessment tool, but that could change; but Harwood lacked motivation to change. According to her, Harwood was a high risk to reoffend.

Four other witnesses also testified on Harwood's behalf: Bruce Dimick, a clinical marriage and family therapist; Cynthia Harwood, Harwood's mother; Kaleb Harwood, Harwood's son; and Chris Seets, Harwood's sister.

In support of the departure motion, defense counsel argued the fact that Harwood had no criminal history, was raising children, had an "impressive" employment record, and had obtained therapy through Bruce Dimick were factors supporting a departure. The court denied the departure motion. The court imposed the presumptive life imprisonment sentence with lifetime postrelease supervision.

Citing K.S.A. 2016 Supp. 22-3424(e)(4), Harwood contends that the trial court's denial of his motion to continue sentencing was an abuse of discretion because it deprived him of his right to present witnesses on his behalf. That law gives a convicted criminal defendant the right to present to the sentencing court any evidence in mitigation of punishment. See *State v. Haney*, 299 Kan. 256, Syl. ¶ 1, 323 P.3d 164 (2014).

The rules for granting a continuance of a sentencing hearing are the same as the rules at trial. See *State v. Beaman*, 295 Kan. 853, 862-64, 286 P.3d 876 (2012). A district court may grant a continuance to either party for good cause shown. K.S.A. 22-3401. The court's decision whether to grant a continuance is reviewed for abuse of discretion. *Lewis*, 299 Kan. at 846.

When a continuance is requested to secure a witness during a trial, the district court considers (1) the possible prejudice to the defendant; (2) the diligence or lack thereof in attempting to secure the witness; (3) the materiality and importance of the probable testimony; and (4) the probability of the witness' appearance at a later date if the continuance is granted. *State v. Carter*, 284 Kan. 312, 319, 160 P.3d 457 (2007); *State v. Lee*, 45 Kan. App. 2d 1001, 1012, 257 P.3d 799 (2011).

13

Here, although Dr. Mintz was not present to testify, the trial court did admit his report into evidence. Counsel argued that, if present, Dr. Mintz could "explain his credentials, his education, his training, and the steps he went through in the evaluation process of Mr. Harwood, as well as the recommendations and conclusions of the evaluation." But this court cannot properly assess the prejudice to Harwood or the materiality and importance of the testimony because Dr. Mintz' report was not included in the record on appeal.

We cannot discern how Dr. Mintz' testimony would have added to the evidence presented. Several other witnesses testified for the defense. Fronk testified about her evaluation of Harwood. Fronk assessed Harwood's need for treatment and his risk level. Dimick testified about his therapy sessions with Harwood. According to defense counsel, Dr. Mintz evaluated Harwood on May 3. Harwood did not make a proffer of the probability of Dr. Mintz' appearance at a later date if a continuance was granted. Given these circumstances, we cannot say that no reasonable person would have denied Harwood's motion for a continuance.

*The Chief Judge and Judge Platt did not err in denying the recusal of Judge Platt.*

Before sentencing, Harwood asked for a change of judge under K.S.A. 20-311d. Harwood set forth his reasons for the motion on the record. The court responded, "[t]his Court can clearly state, I don't have any sort of bias one way or another on it, and so would decline to recuse myself." The court accepted Harwood's affidavit in support of his motion to recuse Judge Platt.

Chief Judge Michael Powers reviewed Harwood's affidavit and denied the motion for a change of judge in an order dated May 11, 2015. The chief judge found that Harwood merely gave subjective opinions of Judge Platt's facial expressions, tone, and inflection of his voice; that Harwood's allegations would not indicate any sort of bias or

14

prejudice to an objective observer; and that Harwood recited Judge Platt's rulings and decisions without evidence that the rulings were based on inappropriate factors. "Nothing has been alleged in the Affidavit which would cause a reasonable person with knowledge of all the circumstances to have a reasonable doubt concerning the judge[']s impartiality."

We now briefly review the law of recusal of trial judges. K.S.A. 20-311d sets out the procedure for requesting a change of judge. If a party believes the assigned judge cannot afford that party a fair trial, the party may file a motion for a change of judge. K.S.A. 20-311d(a). The judge shall then hear the motion informally. If the judge refuses to disqualify himself or herself, the moving party may file an affidavit alleging any of the grounds specified in subsection (c). K.S.A. 20-311d(a)-(b). One of the grounds for a change of judge specified in subsection (c) is that the party filing the affidavit has reason to believe that the judge cannot afford the party a fair and impartial trial or impartial postjudgment remedies because of bias, prejudice, or interest. K.S.A. 20-311d(c)(5). If the party files such affidavit, the chief judge shall at once determine the legal sufficiency of the affidavit. K.S.A. 20-311d(b).

The term "bias" refers to the judge's mental attitude toward a party. Bias and prejudice exist if a judge has a hostile feeling or spirit of ill will against a party or undue friendship or favoritism toward a party. Adverse rulings by the judge on legal issues alone are not sufficient to show bias or prejudice. *State v. Walker*, 283 Kan. 587, 608-09, 153 P.3d 1257 (2007).

When reviewing the legal sufficiency of an affidavit in support of a motion for a change of judge, an appellate court must decide the sufficiency of the affidavit, not the truth of the facts alleged. The appellate court should determine whether the affidavit provides facts and reasons pertaining to the party or the attorney which, if true, give fair support for a well-grounded belief that the defendant will not obtain a fair trial. The appellate court also determines whether the charges are grounded in facts that would

create reasonable doubt concerning the judge's impartiality based on an objective standard of a reasonable person. This court has unlimited review when reviewing the legal sufficiency of the affidavit. *State v. Robinson*, 293 Kan. 1002, 1032, 270 P.3d 1183 (2012).

On appeal, Harwood relies on six allegations made in his affidavit. Each will be discussed below.

"(1) During the first trial, Judge Platt's negative attitude towards the defendant and his attorney was obvious based on facial expressions, tone of voice and inflection of his voice in the presence of the jury, nor did he appear to be listening to the defense attorney's statements to the Court."

Harwood believed that Judge Platt generally displayed a negative attitude toward him based on facial expressions, tone of voice, and inflection of his voice. Unfortunately, this allegation is difficult to review on appeal. Harwood does not give any context, such as what was going on in the trial at the time Judge Platt displayed a negative attitude. Nor does he cite to a point in the record where Judge Platt was unable to make a ruling because the judge was not listening. After two trials presided over by Judge Platt, Harwood was convicted of a serious offense. It is not surprising that Harwood would have an unfavorable view of the judge. But without specific facts to review, this court cannot say that an objective observer would have a reasonable doubt about the judge's impartiality.

"(2) When the first jury could not reach a verdict, Judge Platt asked the jurors several times if they were unable to reach a verdict, indicating a reluctance to accept the jury's position."

16

The allegation that Judge Platt asked jurors several times if they were unable to reach a verdict does not indicate that the judge favored a guilty verdict. The jury could have come back with a not guilty verdict. The judge's questions do not create reasonable doubt concerning his impartiality.

"(3) The State was afforded breaks in the first trial to accommodate witnesses, but Judge Platt became angry and raised his voice when Mr. Harwood's attorney requested a break to accommodate a defense witness. Judge Platt also appeared to be forcing Mr. Harwood to make a decision on whether to testify at that time, instead of after the defense witness."

From our review of the record, the court did ultimately grant Harwood's request to recess. During the second trial, the court did grant the defense breaks when requested. No anger can be discerned from the record. The judge's discretionary decisions to grant recesses do not create reasonable doubt concerning his impartiality.

"(4) During the second trial, Judge Platt appeared to be rushing the proceedings. Mr. Harwood's attorney became ill and would have to leave the courtroom to avoid getting ill in the courtroom. The judge denied her request to continue to the next day."

On day 3 of the trial, defense counsel notified the court that she started getting sick the night before and did not feel well. She said it "comes in waves" and that she may need to exit the courtroom quickly. The court told her if she felt ill, to "just wave, jump, whatever." The court called a recess during the morning due to counsel's illness. On day 4 of the trial, defense counsel asked the court for a lunch break. The court asked if she was okay. Defense counsel responded, "Well, I just need to sit for a bit." The court recessed for lunch.

As we pointed out before, at the end of the evidence, defense counsel asked the court to recess for the day before closing arguments. She stated, "I need some additional time just to collect my thoughts, notes." The court denied her request. Defense counsel then stated that she had "been under the weather the last two days and would like to have a fresh start in the morning." The court then called for a short break, but proceeded with closing arguments that day.

At all times when defense counsel indicated she was getting ill, the court took to a recess. The court asked if she was ok and permitted her to exit the courtroom as necessary. As explained above, the court had discretion to continue the trial until the next day before closing arguments. The court did not abuse its discretion. The fact that the trial court denied defense counsel's request for a continuance until the next day does not create reasonable doubt concerning the judge's impartiality.

> "(5) Judge Platt denied both the State's and defense's requests to have additional time to review jury instructions, giving the impression of rushing the case rather than insuring the trial was done correctly."

The court's denial of both parties' request for additional time to review jury instructions does not indicate that the trial court favored either party. And, the court did grant a short break.

> "(6) Judge Platt did not want to follow the proper procedure for the motion to recuse, and only did so after the State agreed with the defense on the procedure required."

At the hearing on Harwood's motion to recuse Judge Platt, the court noted that it had been awhile since it had looked at K.S.A. 20-311d. The court noted that the chief judge had to review Harwood's affidavit and could assign the case to another judge. But

18

in the interest of judicial economy, the court wanted to take up other motions. The court stated that if the chief judge determined that the case needed to be reassigned, then the court's rulings would be moot. But defense counsel objected because the statute was clear that the motion to change judge should be ruled on by the chief judge before proceeding further. The prosecutor agreed. The court then contacted the chief judge and rescheduled the motions hearing as requested by the parties.

The judge's actions at the hearing did not cast reasonable doubt about the judge's impartiality. The procedure stated in K.S.A. 20-311d was ultimately followed.

Harwood's affidavit was legally insufficient to compel the recusal of Judge Platt.

Going further, recusal is required under the Due Process Clause of the Fourteenth Amendment to the United States Constitution when the judge "'is actually biased or there is a constitutionally intolerable probability of actual bias.'" *State v. Moyer*, 302 Kan. 892, 925-26, 360 P.3d 384 (2015). A two-part test is applied to determine whether the party's due process rights were violated: (1) whether the judge had a duty to recuse himself or herself because the judge was biased, prejudiced, or partial; and (2) if the judge did have a duty to recuse and failed to do so, whether there is a showing of actual bias or prejudice that warrants setting aside the conviction or sentence. *Moyer*, 302 Kan. at 926.

A judge has a duty to recuse himself or herself when the judge's impartiality might reasonably be questioned. *Robinson*, 293 Kan. at 1032. As we set out above, Harwood has not alleged facts to support his contention that Judge Platt had a duty to recuse himself because the judge's impartiality might reasonably be questioned.

We hold that there was no due process violation here when Judge Platt did not recuse himself.

19

*The marital privilege applies to confidential communications and is inapplicable here.*

The State asked Harwood's now ex-wife, Erin, to describe Harwood's actions after Harwood learned of L.P.'s allegation. Specifically, the prosecutor said, "Now, Mrs. Harwood, what I'd like for you to do is, do not say what—anything that John Harwood said. But I would like for you to describe for the jury his actions after [Jessica] left your home. What did you see him do?" Defense counsel objected that her testimony would be a privileged communication. The court overruled the objection.

Erin testified that upon learning of the allegation, Harwood went into the playroom and checked over L.P.'s bedding. He picked up her blanket and looked it over. The prosecutor asked Erin if she was speaking to Harwood as he was doing these things. No objection was made. Erin said she asked Harwood what he was doing. Erin testified that Harwood then went to the laundry room, pulled out the clothes he had worn the day before, and looked them over. The prosecutor again asked Erin if she was speaking to him. No objection was made. Erin said that she again asked Harwood what he was doing, with a little more insistence. Erin testified that Harwood went upstairs to take a shower. She testified she followed him. The prosecutor asked Erin what she said to Harwood. No objection was made. Erin testified that she told Harwood "don't get in the shower," but instead to go the hospital and have a rape kit performed. Harwood showered. Erin testified that later that day, Harwood washed the clothes he had been wearing the day before.

Citing K.S.A. 60-423(b), Harwood contends now that the court erred when it admitted Erin's testimony. K.S.A. 60-423(b) states: "An accused in a criminal action has a privilege to prevent his or her spouse from testifying in such action with respect to any *confidential communication* had or made between them while they were husband and wife" except in situations which are not relevant here. (Emphasis added.)

20

We must also examine another statute. K.S.A. 60-428(a) states:

> "Subject to K.S.A. 60-437 and except as otherwise provided in subsections (b) and (c) of this section, *a spouse who transmitted to the other the information which constitutes the communication*, has a privilege during the marital relationship which he or she may claim whether or not a party to the action, to refuse to disclose and to prevent the other from disclosing *communications* found by the judge to have been had or made in confidence between them while husband and wife. The other spouse or either his or her guardian or conservator may claim the privilege on behalf of the spouse having the privilege." (Emphasis added.)

Our Supreme Court has clarified the marital privilege found in these laws. "The statutory marital privilege between a husband and wife does not extend to all observations of the acts of one spouse by the other. The marital privilege is limited to spoken or written statements or nonverbal signs or gestures seeking to transmit information from one spouse to another." *State v. Newman*, 235 Kan. 29, Syl. ¶ 3, 680 P.2d 257 (1984); *State v. Galloway*, 235 Kan. 70, Syl. ¶ 5, 680 P.2d 268 (1984).

*Newman* is applicable to this case. In *Newman*, the defendant was charged with arson of the Good Times Club in Barton County, burglary, and theft of stereo equipment located within the club. Prior to trial, the defendant filed a motion to suppress his wife's testimony. The State proffered that the wife's testimony would be as follows: On the night the Good Times Club burned down, she was awakened by her husband, the defendant. The defendant left home, returned to get a crowbar, and then left again. They drove near the Good Time Club and saw that it was on fire. After they returned home, she saw her husband unloading stereo speakers. Later, she was present when certain conversations took place between her husband and a third person regarding the purchase of the stereo equipment. She observed her husband sell the equipment to another individual. The trial court suppressed this evidence in its entirety due to marital privilege.

21

The State filed an interlocutory appeal. Our Supreme Court first held that any communications that occurred while a third person was present were not confidential communications protected by marital privilege. 235 Kan. at 37-38. The court then considered whether the wife's observation of the defendant's acts constituted communication. The court stated: "We think it clear that certain acts consisting of gestures or signs or body movements may constitute a privileged communication. Thus, there may be types of nonverbal communications which should properly be considered as communications within the meaning of the statute." 235 Kan. at 38. The court noted that there is "a great deal of conflict" in the decisions of other courts as to the admissibility of one spouse's observation of particular acts by the other spouse. 235 Kan. at 38. With regard to the Kansas statutes, the court held that "to have a communication there must be a transmission of information." 235 Kan. at 40. The court held that the marital privilege "does not extend to all observations of the acts of one spouse by the other. The marital privilege is limited to spoken or written statements or nonverbal signs or gestures seeking to transmit information from one spouse to the other." 235 Kan. at 40. The court held that the trial court erred in suppressing the wife's testimony about observations of the defendant's actions in handling and selling the stereo equipment. 235 Kan. at 40-41.

If we apply these principles to this case, our ruling becomes manifest. Harwood's acts of looking over L.P.'s bedding, pulling his clothes out of the laundry and looking them over, taking a shower, and washing his clothes, lack any indicia of communication. From Erin's testimony, it does not appear that Harwood sought to transmit any information to her by his actions. Erin did not testify about any communication from Harwood to her. She did not testify that he made any gestures or nonverbal signs seeking to transmit information to her. Harwood's acts were not "communication" as contemplated by the marital privilege.

Harwood argues that because he was not hiding his actions, he intended to communicate his actions. The *Newman* court did use an example of a wife, unknown to

22

the husband, observing the husband disposing of a dead body. The court said that marital privilege is "'clearly inapplicable'" in that scenario. 235 Kan. at 39.

But then the *Newman* court went on to interpret the Kansas statute and the public policy in Kansas. 235 Kan. at 38-40. The *Newman* court held that "to have a communication there must be a transmission of information." 235 Kan. at 40. The court's analysis did not turn on whether the husband attempted to conceal the stereo equipment from his wife. The wife's proffered testimony did not allege that her husband was unaware she was watching him unload the stereo equipment and selling it. Rather, the wife proffered that she and her husband went to Hutchinson where she was present for conversations regarding the sale of the equipment. Thus, communication seems to require more than "not hiding" one's actions. In *Galloway*, 235 Kan. at 92, the court did note that the location of the evidence in the back of a crowded drawer would support an inference of intended concealment from the wife, but the court did not say that attempted concealment was a requirement.

For these reasons, we hold that the marital privilege did not apply here.

*The elements jury instruction was not revised as the court intended.*

The complaint alleged that Harwood "unlawfully, feloniously, and intentionally commit[ted] the act of sodomy" with L.P. The proposed jury instruction stated that the State must prove that Harwood acted "knowingly or intentionally." Defense counsel objected to including "knowingly" in the jury instruction. The prosecution agreed that "knowingly" should not be included in the jury instruction. The court agreed to just include "intentionally" and strike the rest of the language.

23

However, when prepared, the instruction included the term "knowingly." Defense counsel objected because "knowingly" was not charged in the complaint. The prosecutor responded that if the State proves "intentionally," then the State has proved "knowingly."

Consequently, the jury was instructed that the State must prove that Harwood "knowingly or intentionally" engaged in sodomy with L.P. The jury was instructed that "A defendant acts 'intentionally' or 'with intent' when it is the defendant's desire or conscious objective to do the act complained about by the State," and "A defendant acts 'knowingly' when the defendant is aware of the nature of his conduct that the State complains about."

To us, Harwood argues that the instruction, as given, impermissibly broadened the charge against him. In other words, the State could have proved he acted knowingly, without having proved that he acted intentionally as charged.

The law on jury instructions is clear. A jury instruction on the elements of a crime that is broader than the charged crime is erroneous. Our Supreme Court has explained:

> "A jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous. The reason for this is because the charging instrument sets out the specific offense alleged to inform the defendant of the nature of the accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation. Accordingly, the State is bound by the wording of its charging document, and the prosecution and district court must use caution in conforming the jury instructions to the charges."

> "Generally, if a jury instruction on the elements of a crime adds alternate statutory elements that were not contained within the language of the complaint or information charging the defendant with a crime, the instruction is overly broad and, thus, erroneous." *State v. McClelland*, 301 Kan. 815, Syl. ¶¶ 4-5, 347 P.3d 211 (2015).

24

When the district court instructs the jury with elements of a crime that are broader than the charged crime, the error is excusable only where the substantial rights of the defendant are not prejudiced. *State v. Jones*, 290 Kan. 373, 383-84, 228 P.3d 394 (2010).

Without citing any authority, the State argues that "knowingly" and "intentionally" are not alternate statutory elements because neither are included in the statutory definition of the crime. The State contends that means the instruction was not overly broad.

But by including the word "intentionally" in the complaint, the State limited itself to that theory of the offense. See *State v. Trautloff*, 289 Kan. 793, 801-03, 217 P.3d 15 (2009). The *Trautloff* court held that in a prosecution for sexual exploitation of a child, the defendant was charged with "displaying" a photograph of a child. The jury was instructed that the defendant displayed, procured, or produced a photograph. The court ruled that by including the phrase "displayed such picture" in the complaint, the State limited itself to that theory of the offense. The broader jury instruction allowed the jury to convict the defendant of displaying, procuring, or producing the photograph. The evidence that the defendant procured or produced the photograph was overwhelming; whereas the evidence that the defendant displayed the photograph was minimal. Thus, there was a real possibility that the jury would have reached a different verdict if only instructed about displaying.

Even so, we fail to see how Harwood's substantial rights were prejudiced by this error. It is difficult to imagine how the jury would have found Harwood put his "pee-pee" in L.P.'s mouth knowingly, but not intentionally.

Harwood's defense did not raise an issue about his mental state. Rather, his defense was to deny that it happened and, if it did happen, to deny that he was the perpetrator. We note that considerable time at trial was spent on the questions about DNA and vasectomies.

25

The evidence supported an intentional act. The evidence showed that Harwood (or someone) put his "pee-pee" in L.P.'s mouth and then rubbed ejaculate on her shirt. In its closing argument, the State argued the act was intentional. Whether Harwood's mental state was anything other than intentional was simply not contested at trial. There is no reasonable possibility that the jury could have found Harwood acted knowingly, but not intentionally. Harwood was not prejudiced by the inclusion of the word "knowingly" in the jury instructions. We will not reverse his conviction for this error.

*We find no compelling reasons that justify a psychological evaluation of L.P.*

Prior to trial, Harwood sought a court order requiring L.P. to submit to a psychological evaluation. The trial court heard testimony from several defense witnesses in support of the motion. The defense argued that there was no corroborating evidence to support L.P.'s disclosure; the sperm cells identified could not have been Harwood's sperm cells because he had had a vasectomy; Harwood's DNA on L.P.'s shirt was not necessarily the result of contact of a sexual nature; there was evidence of a third DNA contributor; L.P.'s young age should be taken into consideration in determining her veracity; L.P. falsely accused another babysitter of striking her; Detective Wilkins did not ask L.P. whether she understood the difference between the truth and a lie; and L.P. did not disclose the abuse to the detective until after he asked her leading questions.

The court denied the motion, and Harwood argues that compelling reasons justified a psychiatric evaluation. In his view, the trial court abused its discretion in denying his motion.

A defendant is entitled to a psychological examination of a complaining witness to a sex crime if the defendant shows that compelling circumstances justify the examination. *State v. Eddy*, 299 Kan. 29, 34, 321 P.3d 12 (2014); *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). To determine if there are compelling circumstances, the court, as

26

stated in *Eddy*, 299 Kan. at 34, examines all of the circumstances and the following nonexclusive list of factors:

> (1)  whether there is corroborating evidence of the complaining witness' version of the facts,
>
> (2) whether the complaining witness demonstrates mental instability,
>
> (3) whether the complaining witness demonstrates a lack of veracity,
>
> (4) whether the complaining witness has made similar charges against others that were proven to be false,
>
> (5) whether the defendant's motion for an evaluation appears to be a fishing expedition, and
>
> 6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth.

It is rarely an abuse of discretion for a district court to deny a request for a psychological evaluation where the complaining witness is a young sex abuse victim. *Eddy*, 299 Kan. at 34; *State v. Berriozabal*, 291 Kan. 568, 581, 243 P.3d 352 (2010).

Here, we examine the record for the six factors set out in *Eddy* and find that there is no compelling reason for a psychological evaluation of L.P.

- Whether there is corroborating evidence of the complaining witness' version of the facts:

The trial court correctly found that the DNA evidence corroborated L.P.'s allegation that Harwood put his penis in her mouth and then rubbed it on her shirt. At the hearing on Harwood's motion for a psychological evaluation of L.P., Amanda Misencik testified that she identified seminal fluid on L.P.'s shirt and on the oral swab from L.P.'s mouth. Dawn Ford testified that she found DNA consistent with Harwood on the shirt. Harwood raised his vasectomy defense at the hearing. But the evidence presented did not

27

establish that Harwood could not have ejaculated nonmotile sperm on the day of the crime.

- Whether the complaining witness demonstrates mental instability:

The trial court correctly found that there was no evidence of any mental instability. The court viewed Detective Wilkins' videotaped interview of L.P. Harwood offered no evidence that L.P. was mentally unstable and only complained of her young age of 4. The court aptly noted that although L.P. was 4 years old at the time of the crime, her mental ability was appropriate for her age. The mere allegation of mental instability does not support the ordering of a psychological evaluation without real evidence. *Berriozabal*, 291 Kan. at 581.

- Whether the complaining witness demonstrates a lack of veracity; and
- Whether the complaining witness has made similar charges against others that were proven to be false:

The trial court correctly found that L.P. did not demonstrate a lack of veracity; there was nothing deceptive or inaccurate in L.P.'s interview. Harwood only complained of L.P.'s young age and alleged that L.P. had falsely accused another babysitter, Shelly Garrett, of hitting her. But Garrett testified at the motions hearing that she did not recall any such incident. Thus, there was no evidence that L.P. demonstrated a lack of veracity or that L.P. had made a similar charge against another. The court also aptly noted that the allegation against Garrett would not be a similar charge.

- Whether the defendant's motion for an evaluation appears to be a fishing expedition:

The trial court found that there was no basis for Harwood's motion and suspected it was a fishing expedition. As none of the factors support Harwood's motion, we can see how the court reached that conclusion.

- Whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth:

At this point, L.P. had not been questioned about her understanding of what it means to tell the truth. Harwood did not call L.P. to testify at the motion hearing. The court noted that L.P.'s conversation with Detective Wilkins seemed appropriate for a 4-year-old child.

Harwood goes on to contend that this case is similar to *State v. Bourassa*, 28 Kan. App. 2d 161, 15 P.3d 835 (1999). The proffered evidence in *Bourassa* showed mental instability and possible lack of veracity. The victim had recently accused her father of sexually molesting her. The victim had mutilated two kittens and had a tendency to soil herself. She was taking Prozac and undergoing mental health counseling for behavioral disorders. This court held there were compelling reasons for the 11-year-old victim to be evaluated. 28 Kan. App. 2d at 166-67.

None of the concerns present in *Bourassa* are present in this case. Harwood has offered no evidence to show L.P.'s mental instability or possible lack of veracity. Unlike *Bourassa*, there was no evidence L.P. had undergone mental health counseling or that she had previously accused anyone of sexually molesting her.

29

Our Supreme Court has upheld numerous denials of motions to compel a psychological evaluation with more supporting evidence than present here. In *State v. Sprung*, 294 Kan. 300, 316-17, 277 P.3d 1100 (2012), the court listed several cases where it had denied motions to compel psychological examinations of victims:

> "*Berriozabel*, 291 Kan. at 582, 243 P.3d 352 (finding evidence of unstable home environment insufficient to support allegation of mental instability; one possible incident of lying about defendant's former stepdaughter's virginity insufficient to support lack of veracity); *Price*, 275 Kan. at 88, 61 P.3d 676 (finding no compelling reasons to justify examination when evidence indicated victim made untruthful statement to a friend but statement was unrelated to contact with defendant, victim made no other false allegations of abuse, victim had engaged in prior sexual contact with her stepbrother, and victim referred to herself as a liar in a letter to her mother but later testified she was not lying about her contact with defendant); *State v. McIntosh*, 274 Kan. 939, 946, 58 P.3d 716 (2002) (finding victim's bedwetting, diagnosis of attention-deficit disorder, behavior problems at school, and resentment for absence of biological father insufficient to support mental instability)."

The trial court here did not abuse its discretion in denying Harwood's motion for a psychological evaluation of L.P.

*Cumulative error.*

In our review of the record, the trial court made, at most, a single error—the jury instruction. A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014). There was no cumulative error.

Affirmed.